# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

Plaintiff,

v.

Timothy John Adams,

Defendant.

Case No. 18-cr-244 (NEB/TNL)

## REPORT AND RECOMMENDATION

Bradley M. Endicott & Andrew R. Winter, Assistant United States Attorneys, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis MN 55415 (for the Government); and

Aaron J. Morrison, Wold Morrison Law, Suite 705, 331 Second Avenue South, Minneapolis, MN 55401 (for Defendant Timothy John Adams).

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Timothy John Adams's Pretrial Motion to Suppress Search and Seizure. (ECF No. 23). This motion has been referred to the undersigned for a report and recommendation to the district court, the Honorable Nancy E. Brasel, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Defendant is charged via indictment with conspiracy to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, possession with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 18 U.S.C. § 2, and felon in possession of ammunition, in violation of 18 U.S.C. §§ 921(g)(1) and 924(a)(1). (ECF No. 1). Defendant filed a motion seeking

1

suppression of evidence obtained following a May 24, 2017 arrest. The Government opposes the motion. A hearing was held on December 4, 2018. (ECF No. 25). The Court heard testimony from the following individuals: Investigator Jerry Wilhelmy of the Minnesota Department of Corrections, Special Agent Robert Fraik of the Minnesota Bureau of Criminal Apprehension, and Trooper Nicholas Otterson of the Minnesota State Patrol. The Court received into evidence: Government Exhibit 1 (transcript of May 23, 2017 telephone call between James Jones and Frankie Perez-Rios); Government Exhibit 2 (transcript of May 23, 2017 telephone call between Timothy John Adams and James Jones); Government Exhibit 3 (photograph of items seized from vehicle); Government Exhibit 4 (photograph of items seized from vehicle); Government Exhibit 5 (photograph of methamphetamine seized from vehicle); Government Exhibit 6 (video of traffic stop of Timothy John Adams; and Defendant Exhibit 1 (complaint/summons issued to Timothy John Adams regarding traffic violations). Post-hearing briefing is complete, (ECF Nos. 30, 31), and the motion is ripe for a determination by the Court. Based upon all the files, records, and proceedings herein, along with the testimony and evidence presented, the undersigned recommends that Defendant's motion be denied.

## I.    FINDINGS OF FACT

Investigator Jerry Wilhelmy of the Minnesota Department of Corrections monitored several telephone calls that occurred at Minnesota correctional facilities between April 21, 2017 and May 23, 2017. (Tr. 8:5-30:12). Each conversation was between James Jones, also known as "Thirsty" (Tr. 12:3-12:9) and either Defendant Timothy John Adams, also known as "Slim" or "Big Boy" (Tr. 11:3-11:7) or Efrain Perez-Rios, also known as "Frankie" (Tr.

CASE 0:18-cr-00244-NEB-TNL   Doc. 32   Filed 02/25/19   Page 3 of 13

12:24-13:3). Adams and Jones are members of the Native Mob gang. (Tr. 11:11-13, 12:6-7,). Wilhelmy believed that Perez-Rios was a narcotics supplier. (Tr. 13:4-5).

Wilhelmy first monitored two calls that occurred on April 21, 2017. (Tr. 13:23-14:1). In the first call, beginning at approximately 5:00 p.m. took place between Adams and Jones. During that call, Jones asked Adams what Perez-Rios was charging. (Tr. 14:13-15). Adams responded "ten." (Tr. 14:13-15). Wilhelmy believed this to be a reference to the price of narcotics. (Tr. 14:4-14).

Wilhelmy also reviewed two calls that took place on April 26, 2017 and one call that occurred on May 8, 2017. (Tr. 15:17-23; 16:11-19). In the April 26 calls, Jones and Adams discussed what Wilhelmy believed to be certain prices that Perez-Rios was charging a different member of the Native Mob. (Tr. 15:24-16:3; Tr. 13:6-16; 13:14-16). In the May 8 call, Jones asked Adams if "homie" "squared [Adams] away." (Tr. 16:11-19). Adams responded affirmatively and told Jones that he received "two." (Tr. 16:18-19). "Homie" is believed to be a reference to Perez-Rios. (Tr. 16:16-17).

Finally, Wilhelmy reviewed two telephone calls that took place on May 23, 2017. (Tr. 17:7-11; Gvt. Ex. 1 & Ex. 2). In the first telephone call, Jones attempted to arrange for Adams to purchase narcotics from Perez-Rios. (Tr. 20:16-25). Perez-Rios indicated that he had previously sold to Adams before, but that it "takes him like a whole week to come back." (Gvt. Ex. 1, p. 8). Jones told Perez-Rios that was because some buyers purchased narcotics from him at lower prices. (Tr. 21:23-22:8; Gvt. Ex. 1, p. 8). At some point during the call, Perez-Rios told Jones that Adams would not "be here till tomorrow." (Gvt. Ex. 1, p. 8). Perez-Rios lived in Minneapolis. (Tr. 23:6-10).

Jones and Adams also spoke on May 23, 2017. (Gvt. Ex. 2). During that call, they discussed prices that Perez-Rios charged other Native Mob members (Tr. 23:21-24:7; Gvt. Ex. 2, pp. 2-3). Jones also told Adams that the more money that he would pay up front, the more drugs Perez-Rios would provide him. (Gvt. Ex. 2, p. 11). Jones also told Adams he needed to sell the drugs that he received as soon as possible so that he could pay Perez-Rios back at a quicker pace. (Tr. 25:7-21; Gvt. Ex. 2, pp. 12-13).

Wilhelmy believed, based on the information that he obtained in these calls, that a narcotics transaction had been arranged. (Tr. 26:14-24). He alerted Special Agent Robert Fraik of the Minnesota Bureau of Criminal Apprehension. (Tr. 26:23-24; 31:8-13). Fraik began to conduct surveillance of Adams's residence, located in Cass Lake, on the evening of May 23. (Tr. 33:7-21). Fraik observed several vehicles parked at Adams's house, including a red Ford Expedition. (Tr. 33:11-34:4).

When Fraik returned to Adams's residence on May 24, There, he noticed that the red Ford Expedition was missing. (Tr. 34:22-25). He asked other agents in the area to assist him in locating it. (Tr. 34:22-35). One agent located it traveling south on Highway 10, near Royalton. (Tr. 35:17-21). Those agents followed the vehicle to a medical clinic located in St. Paul and then to a Car X repair shop. (Tr. 36:7-15). At some point that afternoon, after 1:00 p.m., Fraik traveled to the Car X shop and begin surveilling the vehicle himself. (Tr. 37:2-6).

Fraik observed Adams and his significant other, Ashley Howard leave the area for a short time, before Adams returned to the Car X shop by himself at approximately 3:10 p.m. (Tr. 37:14-38:17). Adams entered the Car X shop and came out with a plastic bag.

4

(Tr. 38:21-39:2). Fraik noticed that the bag "had bulk," but could not identify what was in it. (Tr. 39:7-10). Adams then left the area. (Tr. 39:19-24). Fraik stayed behind and kept watching the vehicle. (Tr. 39:19-24).

Approximately one hour later, Adams and Howard returned to the vehicle. (Tr. 40:2-11). Adams was still carrying the plastic bag. (Tr. 40: 10-17). Adams and Howard then left the Car X in the red Ford Expedition and began traveling toward Interstate 94. (Tr. 41:22-42:4). Fraik contacted State Trooper Nick Otterson and informed him that he believed that Adams was trafficking methamphetamine back to Cass Lake. (Tr. 42:8-16). Fraik also told the trooper that Adams had a suspended object hanging from his rearview mirror. (Tr. 42:14-16). Otterson stopped the vehicle after personally observing the suspended object hanging from the rearview mirror and witnessing the vehicle drive drift over the shoulder line several times. (Tr. 57:5-58:25; Tr. 61:6-9). He approached the passenger side of the Ford Expedition to speak to Adams and Howard. (Tr. 61:12-62:2).

Otterson observed several things when he arrived at the vehicle. First, he noticed that Howard recently lit a cigarette and that multiple air fresheners were in the vehicle. (Tr. 62:3-9; 63:10-15). Second, he saw that Adams's eyes were bloodshot. (Tr. 62:13-15). Third, he observed three cell phones in the center console of the vehicle. (Tr. 63:11-15). Finally, he also noticed a bottle of eye drops. (Tr. 63:10-13).

Each of these observations made Otterson suspicious. In his experience, it was common for individuals to use cigarettes or air fresheners to mask the odor of any contraband in the vehicle. (Tr. 62:6-7; Tr. 64:16-18). He also knew that bloodshot eyes were an indication of recent drug use. (Tr. 62:16-23). In addition, he often observed that

5

individuals engaged in criminal activity had more than one cell phone, in order to avoid law enforcement detection. (Tr. 63:16-64:1). Finally, he believed it common for drug users to take eye drops to remove the redness from their eyes. (Tr. 64:2-10).

Otterson asked Adams for his license and insurance information. (Tr. 64:20-24). Adams told the trooper that he did not have a license but provided him a tribal identification card. (Tr. 64:23-65:9). Howard also provided a tribal identification card. (Tr. 65:22-23). Neither Adams or Howard could locate proof of insurance. (Tr. 66:16-20). Howard attempted to look up her insurance card on her phone. (Tr. 66:16-20).

Howard told Otterson that they were coming from an appointment in St. Paul. (Tr. 66:8-15). As Otterson spoke with both Adams and Howard, he noticed that neither would make eye contact with him and that Howard answered questions that Otterson asked of Adams. (Tr. 66:8-15). Otterson believed their behavior was suspicious. (Tr. 66:8-10, 67:13-21).

As Otterson spoke with Howard, he noticed Adams texting on his phone. (Tr. 67:23-68:2). He asked Adams to exit the Expedition and come back with to his squad car. (Tr. 68:3-7). Adams complied. (Tr. 68:8-10). After entering the squad car, Otterson began looking up Adams's license and asking him about his travels. (Tr. 68:20-25). Adams said they were coming from an appointment in St. Paul but was unable to provide the name of the address or clinic that they visited. (Tr. 69:23-70:7). Otterson asked if they went anywhere else for fun or to eat. (Tr. 70:13-23). Adams said they did not. (Tr. 70:13-23). Adams continued not to make eye contact with Otterson, instead texting on his phone as he spoke. (Tr. 69:13-20).

Otterson discovered that Adams's driver's license had been revoked, but that Howard's license was valid. (Tr. 71:6-10; Tr. 73:1-6). Otterson then returned to the Ford Expedition to speak with Howard and check the vehicle identification number. (Tr. 71:14-18). Howard indicated that she had continued to try and look up her insurance information but had been unsuccessful. (Tr. 72:3-13).

Otterson subsequently issued Adams a ticket for driving after revocation and driving with obscured vision. (Tr. 73: 13-22; Dft. Ex. 1). Adams asked a few questions about the ticket, after which Otterson told him that he had a few more things that he would like to discuss. (Tr. 73:13-22).[1] Otterson began to ask Adams "clarifying questions" about their travels, including information related to the clinic and the appointment. (Tr. 74:3-10). Adams could not answer those questions. (Tr. 74:3-10). Otterson also asked if there was any guns, money, or drugs in the car. (Tr. 74:11-14). Adams responded in the negative but refused to look the trooper in the eye. (Tr. 74:15-20). Finally, Otterson asked for consent to search the vehicle. (Tr. 74:18-20). Adams said that Otterson would need to ask Howard because it was not his vehicle. (Tr. 74:18-20).

As Otterson spoke with Adams, he observed Howard reaching behind the vehicle console and driver's seat. (Tr. 75:2-10). He immediately went over to the passenger side and ordered her out of the vehicle. (Tr. 75:11-18). He then began to ask her "clarifying questions about their travels." (Tr. 76:14-22). Howard told him that they had visited a doctor and gone to a car repair place to get their brakes fixed. (Tr. 76:14-22). Otterson also

---

[1] It took Trooper Otterson approximately 16 minutes and 30 seconds following the stop to issue Adams the traffic citation. (Ex. 6).

asked if there were any illegal items in the car, including a list of specific drugs. (Tr. 77:15-22). When he asked if they had meth in the car, Howard tilted her head down and lowered her voice and tone and said "no, no." (Tr. 77:23-78:11). This was a clear deviation from the way that she answered the trooper's other answers. (Tr. 78:10-11). Otterson then asked for consent to search the vehicle. (Tr. 78:12-14). Howard questioned why a search was necessary, but ultimately declined to permit it. (Tr. 78:12-25).

Otterson then told Howard and Adams that he would conduct a K9 search of the car.[2] (Tr. 78:22-25). He then asked Howard if there was any reason to believe his K9 would alert to the odor of drugs. (Tr. 79:1-5). Howard said, "Not that I'm aware of." (Tr. 79:3-5). Her response was significant to Otterson because he believed it showed she was trying to "deny culpability or knowledge of something illegal." (Tr. 79:9-13).

Otterson's K9, which is trained to detect drug odors, including meth, twice alerted to the odor of drugs near the rear-driver-side door. (Tr. 80:9-14; Tr. 81:3-82:4). Otterson then searched the vehicle. (Tr. 82:13-14). He located a red shoebox in a bag, covered by a blanket. (Tr. 82:18-83:2). In it, he observed two taped-up packages that smelled strongly of methamphetamine, as well as multiple rounds of ammunition. (Tr. 82:18-83:23). Testing later confirmed the taped-up packages to be methamphetamine (Tr. 85:9-15).

## II.   CONCLUSIONS OF LAW

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S.

---

[2] Approximately 8-9 minutes elapsed between the time that Trooper Otterson issued the traffic citation and began the K9 search. (Ex. 6).

Const. amend. IV. It is well settled that a warrantless search or seizure is "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted). Included among these exceptions is the authority for law enforcement to perform an investigative traffic stop when they have a reasonable suspicion of criminal activity. *United States v. Tamayo-Baez*, 820 F.3d 308, 312 (8th Cir. 2016). "After a law enforcement officer initiates a traffic stop, the officer 'may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation.'" *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013) (quoting *United States v. Barragan,* 379 F.3d 524, 528 (8th Cir. 2004)). "These tasks include a computerized check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning." *Id*. "An officer also may request that the driver sit in the patrol car to answer questions and may ask questions about his itinerary." *Id*.

But once the officer has completed those routine tasks, further investigation, including a dog sniff, is unreasonable "unless something that occurred during the traffic stop generated the necessary reasonable suspicion" to justify further investigation or "unless the continued encounter is consensual." *United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007) (quotation omitted); *see also De La Rosa v. White*, 852 F.3d 740, 743 (8th Cir. 2017). "Reasonable suspicion 'is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause.'" *United States v. Mosley*, 878 F.3d 246, 251 (8th Cir. 2017) (quoting *Navarette v.*

9

*California*, 572 U.S. 393, 397 (2014)). "Reasonable suspicion exists when an officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (quotation omitted). Though the officer must have more than a "inchoate hunch," "the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *Tomayo-Baez*, 820 F.3d at 312 (quotation omitted). "In determining whether reasonable suspicion exists, [the Court] consider[s] the totality of the circumstances in light of the officers' experience and specialized training." *United States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). This includes the "collective knowledge of all law enforcement officers conducting the investigation." *Mosley*, 878 F.3d at 254.

In this case, Adams does not dispute that the trooper was initially justified in making the traffic stop. Nor does he contend, following the dog sniff, that the trooper had probable cause to search his vehicle. Instead, he argues that the trooper had no basis to extend the stop after he finished issuing Adams a ticket for driving after revocation. The Court does not find this argument persuasive.

There are several factors that support Otterson's reasonable suspicion and thus justify the extension of the traffic stop. First, before Otterson even pulled Adams over, he knew that Adams was a Native Mob gang member. He also knew that Adams had been in contact with Jones, an incarcerated Native Mob member, who had been trying to broker a sale between Adams and a narcotics supplier. The trooper further knew, based on a text that Adams sent to the narcotics supplier, that Adams would be in Minneapolis that day.

The trooper also knew that Adams and Jones had recently had multiple conversations regarding drug pricing and sales strategy. Each of these factors would reasonably support the trooper's suspicion of criminal activity. *Cf. United States v. Woods*, 829 F.3d 675, 679-80 (8th Cir. 2016) (noting that officer's knowledge that defendant was a drug trafficker contributed to reasonable suspicion); *see also United States v. Roelandt*, 827 F.3d 746, 748-49 (8th Cir. 2016) (noting gang membership to be component of reasonable suspicion). Alone, these factors might justify the extension of the stop.

Second, upon approach, the trooper saw a number of suspicious items in the car. He observed multiple air fresheners and three cell phones, one more than the number of occupants in the vehicle. The trooper believed, based on his training and experience, that the presence of those items indicated that the person was engaged in drug trafficking. *See United States v. Thompson*, 881 F.3d 629, 633 (8th Cir. 2018) (noting, in challenge to sufficiency of evidence, that multiple cell phones, among other items, to be evidence of drug trafficking). These items further provide the officer reasonable suspicion to be believe that criminal activity was afoot.

Finally, the trooper also noticed that Adams and Howard exhibited nervous and evasive behavior. When the trooper first began to question Adams, Howard answered for him. *Quintero-Felix*, 714 F.3d at 567-68 (upholding district court finding that person answering questions directed at another could contribute to officer's reasonable suspicion). During the entirety of the traffic stop, both Adams and Howard refused to look at the trooper and Adams began to text or otherwise fiddle with his cell phone as the trooper questioned them. Howard had also begun to smoke a cigarette, which the trooper believed

11

showed that she was nervous or trying to cover up the smell of narcotics. This behavior could also reasonably contribute to the trooper's reasonable suspicion. *See United States v. Bloomfield,* 40 F.3d 910, 918-19 (8th Cir. 1994) (noting that extreme nervousness can be suspicious). Adams also omitted the fact he picked up a bag at the car repair shop. *United States v. Jones*, 990 F.2d 405, 408 (8th Cir. 1993) (determining that deceptive answers, when combined with nervous behavior, could constitute reasonable suspicion). Furthermore, when the trooper spoke with Adams, he noticed Howard fiddling with items located in the backseat. *See United States v. Coker*, 648 F. App'x T1-1 541, 545 (6th Cir. 2016) (noting officer had reasonable suspicion to extend stop where defendant was reaching into backseat and "digging around"). Combined, all of these factors also contribute to the trooper's reasonable suspicion that he required further investigation into criminal activity.

Based on the foregoing, this Court concludes the roughly 15-minute extension of the traffic stop in order for the dog sniff to go forward was permissible under the Fourth Amendment. Once the dog alerted to the presence of drugs in the vehicle, probable cause existed, and a warrantless search of the vehicle was justified under the automobile exception to the Fourth Amendment. *United States v. Sanchez*, 417 F.3d 971, 976 (8th Cir. 2005). The Court therefore recommends that Adams's motion to suppress be denied.

[signature on next page]

12

## III.   RECOMMENDATION

Based upon the foregoing, and all files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Pretrial Motion to Suppress Search and Seizure, (ECF No. 23), be **DENIED**.

Date: February 25, 2019                                 *s/ Tony N. Leung*
                                                        Tony N. Leung
                                                        United States Magistrate Judge
                                                        District of Minnesota

                                                        *United States v. Adams*
                                                        Case No. 18-cr-244 (NEB/TNL)

## <u>NOTICE</u>

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.